1

2

3

4

5

6

7

8 　　　　　　　　IN THE UNITED STATES DISTRICT COURT

9 　　　　　　　FOR THE EASTERN DISTRICT OF CALIFORNIA

10 DARRYL GRIM,

11 　　　　　　Petitioner,　　　　　No. CIV S-08-1462-GEB-TJB

12 　　　vs.

13 D. K. SISTO,

14 　　　　　　Respondent.　　　ORDER, FINDINGS AND RECOMMENDATIONS

15 _____/

16 　　　　　　　　　　　I.  INTRODUCTION

17 　　　　Petitioner Darryl Grim is a state prisoner proceeding pro se with a petition for writ of

18 habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) Petitioner's requests

19 are denied; and (2) it is recommended that habeas, declaratory, and injunctive relief be denied.

20 　　　　　　　　　　II.  PROCEDURAL HISTORY

21 　　　　Petitioner is currently serving a sentence of fifteen years to life, plus a one year

22 enhancement, following his 1989 conviction for second degree murder in the Alameda County

23 Superior Court.  Pet'r's Pet. 1, ECF No. 1.  In the instant action, Petitioner challenges the

24 decision by the California Board of Parole Hearings (the "Board") denying Petitioner parole.

25 Petitioner appeared before the Board on August 9, 2007.

26 ///

On December 26, 2007, Petitioner filed a petition for writ of habeas corpus with the Alameda County Superior Court challenging the Board's decision. *See* Resp't's Answer Ex. 1, ECF No. 12. The Superior Court issued a reasoned opinion, dated December 26, 2007, denying the petition. *See* Resp't's Answer Ex. 2. Petitioner sought relief in the California Court of Appeal, First Appellate District, and the California Supreme Court; those petitions were likewise denied, but without written opinions. *See* Resp't's Answer Exs. 3-6.

On July 25, 2008, Petitioner filed the instant federal petition for writ of habeas corpus. Respondent filed an answer to the petition on April 16, 2009, to which Petitioner filed a traverse on August 13, 2010.

## III.  FACTUAL BACKGROUND

On December 24, 1988, Officer Gloekler . . . of the Oakland Police Department[] responded to 5314 East 12th Street to investigate a possible auto accident. Upon arriving at the scene, Officer Gloekler observed a vehicle that had run over a fire hydrant by a man, later identified as Darryl Grim, who was standing by the passenger side of the car. As Officer Gloekler approached the car he observed a man, later identified as the victim, Jeffrey Anderson, in the driver's side of the vehicle hunched over the steering wheel, unconscious and bleeding from his back. Officer Gloekler searched Mr. Grim and found a knife that was later identified as the murder weapon. The investigation revealed that Mr. Anderson was at the Sadistics Motorcycle Clubhouse when Mr. Grim was asked to unlock the gate to the clubhouse grounds in order for Mr. Anderson to leave. Mr. Grim indicated that Mr. Anderson punched him in the head and said, quotes, 'Your Mama,' end quotes. Grim then pulled a knife approximately 10 to 12 inches long from a sheath on his side and stabbed Mr. Anderson in the back. It was reported that Mr. Anderson made it back to his car, but there was no way to tell from the reports how far or where his car was in relationship to the clubhouse. When Mr. Anderson was discovered in his vehicle he had defensive wounds on his wrists. The reports also indicate that Mr. Anderson's wallet was not on his person at the time of the discovery of his body. Grim confessed to Sergeant Thiem . . . . Mr. Grim said that Anderson punched him in the head and said, quotes, 'Your Mama,' end quotes. Grim's natural

///

///

///

1  reaction was to knife him.  He said he meant to knife him in the
2  leg.[1]

3       Petitioner was "the youngest of six children," and his parents separated when he was
4  "about one years old."  Resp't's Answer Ex. 1, at 56; Parole Hr'g Tr. 37, Aug. 9, 2007.
5  Petitioner was "reared primarily by [his] mother who had significant medical problems," so "her
6  main source of income was AFDC."  Resp't's Answer Ex. 1, at 56; Parole Hr'g Tr. 37.
7  Petitioner's father did not contribute to the household.  Resp't's Answer Ex. 1, at 56-57; Parole
8  Hr'g Tr. 37-38.  After the divorce, Petitioner's father moved to Texas for seven years, and
9  Petitioner "had no contact with him during that time."  Resp't's Answer Ex. 1, at 57; Parole Hr'g
10  Tr. 38.  Petitioner's father "had taken [his] sisters, Vicky and Valerie, and [his] older sister
11  Marian, with him."  Resp't's Answer Ex. 1, at 58; Parole Hr'g Tr. 39.  So, Petitioner lived with
12  his mother; his sister, Terry; and his brother, Otis.  Resp't's Answer Ex. 1, at 58; Parole Hr'g Tr.
13  39.

14       When Petitioner was eight years old, he "had spinal meningitis," where he "flat lined" at
15  the hospital and "had frontal lobe brain damage."  Resp't's Answer Ex. 1, at 65; Parole Hr'g Tr.
16  46.  Petitioner claimed that prior to his illness, he "liked going to school," but afterward,
17  "everything went bad," and his "attitude changed."  Resp't's Answer Ex. 1, at 65; Parole Hr'g Tr.
18  46.  Petitioner dropped out of school around the ninth or tenth grade.  Resp't's Answer Ex. 1, at
19  59; Parole Hr'g Tr. 40.  He quit "so he could help his mother" and went to work "unloading
20  trucks."  At the hearing, Petitioner claimed:  (1) he communicated with Otis and Marian about
21  once a month; (2) he had not spoken with Terry for about four years; (3) he had not seen Valerie
22  in almost twenty years; and (4) he had not seen Vicky in about twenty-five years.  Resp't's
23  Answer Ex. 1, at 58-59; Parole Hr'g Tr. 39-40.

24
25       [1] The facts of the commitment offense are from the transcript of the Board's hearing on
November 8, 2007.  Resp't's Answer Ex. 1, at 30-32; Parole Hr'g Tr. 11-13, Aug. 9, 2007
26  (reading commitment offense from "most recent Board packet . . . prepared for this hearing,"
dated May 11, 2007).

3

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one state court has adjudicated a petitioner's claims, a federal habeas court analyzes the last reasoned decision.  *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (finding presumption that later unexplained orders, upholding judgment or rejecting same claim, rests upon same ground as prior order)).  Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law.  *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that

4

1  determination was unreasonable-a substantially higher threshold."  *Schriro v. Landrigan*, 550

2  U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

3                              V.  CLAIMS FOR REVIEW

4         Petitioner sets forth five requests and one ground for relief.  Specifically, Petitioner

5  requests:  (1) an order to show cause; (2) appointment of counsel; (3) discovery; (4) an

6  evidentiary hearing; and (5) judicial notice.  Pet'r's Pet. 16; Pet'r's Req. For Judicial Notice, ECF

7  No. 17.  Petitioner also claims that the Board's parole denial violated his due process rights and

8  seeks habeas, declaratory, and injunctive relief.  Pet'r's Pet. 16.

9         A.  First Request:  Order To Show Cause

10        First, in his prayer for relief, Petitioner requests "an Order To Show Cause on an

11  expedited basis" under Rule 4.551 of the California Rules of Court.  *Id.*  As stated earlier,

12  Respondent filed an answer to the petition on April 16, 2009, to which Petitioner filed a traverse

13  on August 13, 2010.  Accordingly, Petitioner's request for an order to show cause is denied as

14  moot.

15        B.  Second Request:  Appoint Counsel

16        Second, Petitioner requests appointment of counsel in further litigation of this action.  *Id.*

17  The Sixth Amendment right to counsel does not apply in habeas corpus actions.  *See Knaubert v.*

18  *Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  A district court, however, may appoint counsel to

19  represent a habeas petitioner whenever "the court determines that the interests of justice so

20  require," and such person is financially unable to obtain representation.  18 U.S.C. §

21  3006A(a)(2)(B).  The decision to appoint counsel is within the district court's discretion.  *See*

22  *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Courts have made appointment of

23  counsel the exception rather than the rule by limiting it to:  (1) capital cases; (2) cases that turn

24  on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases

25  involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require

26  the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner

1    is in no position to investigate crucial facts; and (6) factually complex cases.  *See generally* 1 J.

2    LIEBMAN & R. HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 12.3b, at 383-86

3    (2d ed. 1994).  Appointment is mandatory only when the circumstances of a particular case

4    indicate that appointed counsel is necessary to prevent due process violations.  *See Chaney*, 801

5    F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

6        Appointment of counsel is not warranted in this case.  Petitioner's claims are typical

7    claims that arise in habeas petitions and are not especially complex.  This is not an exceptional

8    case that would warrant representation on federal habeas review.  Thus, Petitioner's request for

9    appointment of counsel is denied.

10       C.  Third Request:  Discovery

11       Third, Petitioner requests discovery.  Pet'r's Pet. 16.  "The writ of habeas corpus is not a

12   proceeding in the original criminal prosecution but an independent civil suit."  *Riddle v. Dyche*,

13   262 U.S. 333, 335-36 (1923); *see*, *e.g.*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14 (1992)

14   (O'Connor, J., dissenting).  However, modern habeas corpus procedure has the same function as

15   an ordinary appeal.  *O'Neal v. McAnnich*, 513 U.S. 432, 442 (1995) (recognizing federal court's

16   function in habeas corpus proceedings is to "review errors in state criminal trials" (emphasis

17   omitted)).  A habeas proceeding does not proceed to "trial," and unlike other civil litigation,

18   parties in a habeas proceeding are not entitled to discovery as a matter of course.  *Bracy v.*

19   *Gramley*, 520 U.S. 899, 904 (1997); *Harris v. Nelson*, 394 U.S. 286, 295 (1969).  Although

20   discovery is available pursuant to Rule 6 of the Federal Rules Governing Section 2254 Cases, it

21   is only granted at the court's discretion, and upon a showing of good cause.  *Bracy*, 520 U.S. at

22   904; *McDaniel v. U.S. District Court* (*Jones*), 127 F.3d 886, 888 (9th Cir. 1997); *Jones v. Wood*,

23   114 F.3d 1002, 1009 (9th Cir. 1997); *see also* Rule 6(a), Federal Rules Governing Section 2254

24   Cases.

25       Good cause is shown "where specific allegations before the court show reason to believe

26   that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

1  entitled to relief." *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. at 300); *see*

2  *also Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2004).  A request for discovery "must also

3  include any proposed interrogatories and requests for admission, and must specify any requested

4  documents."  Rule 6(b), Federal Rules Governing Section 2254 Cases.  Federal courts have "the

5  power to 'fashion appropriate modes of procedure,' including discovery, to dispose of habeas

6  petitions 'as law and justice require[.]'"  *Bracy*, 520 U.S. at 904 (citations omitted) (quoting

7  *Harris*, 394 U.S. at 299-300); *see also Bittaker*, 331 F.3d at 728.

8      Here, Petitioner does not demonstrate good cause as to why his request for discovery

9  should be granted.  Petitioner does not state why discovery is necessary, or why discovery is

10 relevant to a determination of the petition's merits.  Petitioner also does not include any proposed

11 interrogatories or requests for admission, and fails to specify any requested documents, as

12 required under Rule 6(b).  *See* Rule 6(b), Federal Rules Governing Section 2254 Cases.

13 Petitioner, therefore, fails to establish good cause, and absent any good cause, Petitioner's

14 request for discovery is denied.

15      D.  Fourth Request:  Evidentiary Hearing

16      Fourth, Petitioner requests an evidentiary hearing.  Pet'r's Pet. 16.  Under 28 U.S.C. §

17 2254(e)(2), a district court presented with a request for an evidentiary hearing must first

18 determine whether a factual basis exists in the record to support a petitioner's claims and, if not,

19 whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078

20 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v.*

21 *Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  "[W]here the petitioner establishes a colorable

22 claim for relief and has never been afforded a state or federal hearing on this claim, we must

23 remand to the district court for an evidentiary hearing."  *Earp*, 431 F.3d at 1167 (citing

24 *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004);

25 *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)).  In other words, a hearing is required if:

26 "(1) [the defendant] has alleged facts that, if proven, would entitle him to habeas relief, and (2)

7

1  he did not receive a full and fair opportunity to develop those facts[.]"  *Williams v. Woodford*,

2  384 F.3d 567, 586 (9th Cir. 2004).

3        Here, Petitioner's request does not establish that these requirements are satisfied such that

4  an evidentiary hearing would be appropriate.  As explained later, Petitioner does not allege facts

5  that establish a colorable claim for relief because the Board's parole denial is supported by "some

6  evidence" demonstrating future dangerousness, and the Superior Court's decision is reasonable.

7  *See infra* Part V.F.  Accordingly, Petitioner's request for an evidentiary hearing is denied.

8        E.  Fifth Request:  Judicial Notice

9        Fifth, in a separate "motion requesting the court [to] take judicial notice," Petitioner

10  requests judicial notice of *Ledesma v. Marshall*, 658 F. Supp. 2d 1155 (E.D. Cal. 2009), and

11  *Hoffman v. Marshall*, No. CV S-08-1427-R (RNB), 2009 U.S. Dist. LEXIS 73917 (C.D. Cal.

12  Jan. 13, 2009).  Pet'r's Req. For Judicial Notice 1.  While judicial notice of these rulings may be

13  taken, *United States v. Wilson*, 631 F.2d 118, 119-20 (9th Cir. 1980) ("[A] court may take

14  judicial notice of its own records in other cases, as well as the records of an inferior court in other

15  cases."), here, judicial notice is unnecessary because the rulings do not alter the determination of

16  the case.  *See Ventura Mobilehome Cmtys. Owners Ass'n v. City of San Buenaventura*, 371 F.3d

17  1046, 1052 n.5 (9th Cir. 2004) (denying request for judicial notice of rulings by other courts,

18  where rulings, "in any event, . . . do not alter our determination of the case").  Petitioner's

19  pleadings are treated as supplemental briefing, and the request for judicial notice is denied.

20        Thus, this matter is now ready for decision.  For the following reasons, it is recommended

21  that habeas, declaratory, and injunctive relief be denied.

22        F.  Due Process Claim

23        Petitioner claims that the Board's parole denial violated his due process rights because

24  "there is no evidence with an 'indicia of reliability' that petitioner is a current or unreasonable

25  risk or danger to society."  Pet'r's Pet. 4.  Specifically, Petitioner alleges that:  (1) "[t]he Board

26  had no basis for using the crime itself against Petitioner," *id.* at 9 (contending "Petitioner did not

8

1  do anything to torment, terrorize, or gratuitously inflict physical or emotional trauma"); *id.* at 14

2  (claiming Board improperly concluded Petitioner's motive for crime was very trivial); *id.* at 15

3  (asserting Board abused its discretion by finding Petitioner had clear opportunity to cease but did

4  not); (2) "[t]he psych report is totally supportive of parole," *id.* at 13; (3) the Board mistakenly

5  relied on Petitioner's "past alcohol and drug abuse" because "past alcohol or drug addiction is

6  not a factor tending to show unsuitability," *id.* at 14; and (4) the Board denied "Petitioner's

7  version of the events that day." *Id.* For the following reasons, Petitioner's allegations lack merit.

8              1. Legal Standard for Parole Denial

9       The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

10  a person of life, liberty, or property without due process of law. A person alleging a due process

11  violation must first demonstrate that he or she was deprived of a protected liberty or property

12  interest, and then show that the procedures attendant upon the deprivation were not

13  constitutionally sufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

14  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

15       A protected liberty interest may arise from either the Due Process Clause itself or from

16  state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution

17  does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

18  date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). The full panoply of rights afforded a

19  defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

20  proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme

21  Court has held that a parole board's procedures are constitutionally adequate if the inmate is

22  given an opportunity to be heard and a decision informing him of the reasons he did not qualify

23  for parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). If a

24  state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

25  parole release will be granted' when or unless certain designated findings are made," thereby

26  ///

9

1  giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,

2  442 U.S. at 12).

3         In California, Penal Code Section 3041 sets forth the state's legislative standards for

4  determining parole for life-sentenced prisoners.  Subsection (a) provides that "[o]ne year prior to

5  the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate

6  and shall normally set a parole release date . . . ."  Subsection (b) provides an exception to the

7  regular and early setting of a life-sentenced individual's term, if the Board determines "that the

8  gravity of the current convicted offense or offenses, or the timing and gravity of current or past

9  convicted offense or offenses, is such that consideration of the public safety requires a more

10  lengthy period of incarceration . . . ."  Based on this statute, California state prisoners who have

11  been sentenced to prison with the possibility of parole have a clearly established, constitutionally

12  protected liberty interest in receipt of a parole release date.  *Allen*, 482 U.S. at 377-78 (quoting

13  *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v.

14  *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910,

15  914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

16         Additionally, as a matter of California state law, denial of parole to state inmates must be

17  supported by at least "some evidence" demonstrating future dangerousness.  *Hayward v.*

18  *Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th

19  1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr.

20  3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d

21  174 (2002)).  California's "some evidence" requirement is a component of the liberty interest

22  created by the state's parole system.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The

23  federal Due Process Clause requires, in turn, that California comply with its own "some

24  evidence" requirement.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).

25  Thus, a reviewing court such as this one must "decide whether the California judicial decision

26  approving the . . . decision rejecting parole was an 'unreasonable application' of the California

1   'some evidence' requirement, or was 'based on an unreasonable determination of the facts in

2   light of the evidence.'" *Hayward*, 603 F.3d at 562-63.

3          The analysis of whether some evidence supports the denial of parole to a California state

4   inmate is framed by the state's statutes and regulations governing parole suitability

5   determinations. *See Irons*, 505 F.3d at 851.  A reviewing court "must look to California law to

6   determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then

7   must review the record to determine whether the state court decision holding that these findings

8   were supported by 'some evidence' [] constituted an unreasonable application of the 'some

9   evidence' principle." *Id*.

10          Title 15, Section 2402 of the California Code of Regulations sets forth various factors to

11  be considered by the Board in its parole suitability findings for murderers.  The Board is directed

12  to consider all relevant, reliable information available regarding

13                      the circumstances of the prisoner's social history; past and present
                        mental state; past criminal history, including involvement in other
14                      criminal misconduct which is reliably documented; the base and
                        other commitment offenses, including behavior before, during and
15                      after the crime; past and present attitude toward the crime; any
                        conditions of treatment or control, including the use of special
16                      conditions under which the prisoner may safely be released to the
                        community; and any other information which bears on the
17                      prisoner's suitability for release.

18  CAL. CODE REGS. tit. 15, § 2402(b).  The regulation also lists specific circumstances which tend

19  to show suitability or unsuitability for parole.  *Id.* § 2402(c)-(d).

20          Under the applicable state regulations, factors relating to a commitment offense tend to

21  show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the

22  offense was carried out in a dispassionate and calculated manner, such as an execution-style

23  murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a

24  manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the

25  motive for the crime is inexplicable or very trivial in relation to the offense.  *Id.* § 2402(c)(1)(A)-

26  (E).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

>  (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
>  (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.
>
>  (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
>
>  (4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.
>
>  (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>
>  (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
>
>  (7) Age.  The prisoner's present age reduces the probability of recidivism.
>
>  (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
>  (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d)(1)-(9).

The overriding concern is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535 .  Thus, the proper articulation of the standard of review is not whether some evidence supports the stated reasons for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

1   conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th

2   at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

3                         2.  State Court Decision

4           Here, because the California Supreme Court and California Court of Appeal summarily

5   denied the petition, the state court decision appropriate for review is the Superior Court's

6   decision.  Under AEDPA standards, the Superior Court properly held that "[t]he record presented

7   to this Court for review demonstrates that there was certainly some evidence" showing

8   Petitioner's current dangerousness.  *See* Resp't's Answer Ex. 2, at 2.  The Superior Court found

9   the Board articulated negative factors, in addition to those related to the commitment offense,

10   which weighed in favor of denying parole.  The Superior Court considered Petitioner's (1)

11   commitment offense; (2) unstable history, including history of violent assaults and extensive

12   drug and alcohol abuse; (3) need for continued participation in Narcotics Anonymous (NA) and

13   Alcoholics Anonymous (AA), and to be more committed to the twelve step program; (4)

14   psychological report by Dr. M. Geca indicating Petitioner's anti-social personality disorder, and

15   future violent recidivism risk being at a moderate level; and (5) lack of documented parole plans

16   for residence and employment.  *Id.*

17                         a.  Commitment Offense

18           First, the Superior Court properly noted that the Board considered Petitioner's

19   "committing offense," among other factors, when denying parole.  *Id.*  The Board read into the

20   record the summary of Petitioner's commitment offense, taken from the most recent Board

21   packet prepared for the hearing.  *See supra* Part III.  At the hearing and in summary, the Board

22   explained its reliance, in part, on Petitioner's offense as follows:

23               This offense was carried out in an especially cruel and callous
                manner.  This was a callous offense tha[t] an investigation revealed
24               started at the Sadistics Motorcycle Clubhouse when the inmate was
                asked to unlock the gate to the clubhouse grounds in order for
25               Jeffery Anderson to leave.  The inmate claimed Anderson punched
                him in the head and said, "Your Mama."  In response, the inmate
26               pulled a 10 to 12 inch long knife from a sheath on his side and

                                        13

1
2
3
4
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

stabbed Anderson in the back.  On December 24, 1988, Oakland Police Officer Gloekler responded to 5314 East 12th Street to investigate an auto accident.  A vehicle had run over a fire hydrant.  This inmate was standing by the passenger side of the car.  Victim Anderson was in the driver's side of the vehicle hunched over the steering wheel unconscious and bleeding from his back.  Officer Gloekler searched the inmate and found the knife later identified as the murder weapon.

. . . .

You were standing by the passenger side of the car.  This offense was carried out, moreover, in a manner demonstrating exceptionally callous disregard for human suffering.  Public safety was at risk.  It was a vehicle accident in a public street.  And you had a clear opportunity to cease, but you didn't pick up that opportunity.  First, you had a clear opportunity not to drink, and we're going to go into this in a minute.  Moreover, the motive for this crime was very trivial.  If, indeed, it was true, it was, according to you, retaliation for an expletive and a face blow to the head directed at you.  The problem with this story, sir, is that it's just simply not credible.  It wasn't credible when I read it.  It's not credible to this Panel.  You said today that tragically, you don't truly remember, not when asked the specifics about the crime. . . .  And if pressed, you're not sure that what you said is even true, not as to what this gentleman said to you, nor to how you got hit.  And you weren't injured.  So, we can only surmise that it wasn't that significant.  The hit couldn't have been that significant.  Yet, you pulled out a knife, and, inexplicably, he ended up stabbed in the back.  This Panel has to question what is this inmate's level of insight, and, most importantly, is this inmate telling the truth, and are you telling the truth to yourself.

Resp't's Answer Ex. 1, at 140-41, 145-46; Parole Hr'g Tr. 121-22, 126-27.

At the hearing, the Board acknowledged that they "heard the few words" that the victim allegedly said to Petitioner, prior to the murder.  Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 30.  The Board then asked, "[D]o you remember saying anything to him?"  Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 30.  Petitioner responded, "No, I don't remember," but "I don't think so."  Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 30.  The Board could not bridge the gap "from some remark that someone makes," who Petitioner did not know, to "stabbing and killing him in the back."  Resp't's Answer Ex. 1, at 37; Parole Hr'g Tr. 18.  Petitioner replied, "To be honest with you, I don't understand it either.  You know, I don't know why that happened.  I

14

1   wish it never would have happened."  Resp't's Answer Ex. 1, at 37; Parole Hr'g Tr. 18.  Thus,

2   the Superior Court properly found that the Board weighed the nature and gravity of Petitioner's

3   commitment offense.

4                 b. Unstable History, Including History of Violent Assaults and Extensive

5                                Drug and Alcohol Abuse

6          Second, the Superior Court appropriately noted that the Board reviewed Petitioner's

7   "unstable history," including his "history of violent assaults" and "extensive drug and alcohol

8   abuse.  Resp't's Answer Ex. 2, at 2.  Petitioner was in a "boys home" from age eleven to about

9   fourteen or fifteen.  Resp't's Answer Ex. 1, at 60-61; Parole Hr'g Tr. 41-42.  Petitioner started

10  drinking, "doing drugs, starting smoking weed at a young age, started doing barbiturates at a

11  young age, and started smoking crank [sic] at about 17 or 18."[2]  Resp't's Answer Ex. 1, at 60;

12  Parole Hr'g Tr. 41.

13         At the hearing, the Board first noted that they did not have Petitioner's "criminal arrest

14  record," only a record "as to convictions now."  Resp't's Answer Ex. 1, at 50; Parole Hr'g Tr. 31.

15   Nevertheless, the Board commented that Petitioner had "a significant adult record."  Resp't's

16  Answer Ex. 1, at 50; Parole Hr'g Tr. 31.

17         Petitioner's "first offense . . . as an adult was a hit and run" in 1982.  Resp't's Answer Ex.

18  1, at 50; Parole Hr'g Tr. 31.  "It's a 20002(A) with property damage."  Resp't's Answer Ex. 1, at

19  50; Parole Hr'g Tr. 31.  Petitioner "received probation, jail," which was "modified on two

20  occasions to include 20 days of county jail each time."  Resp't's Answer Ex. 1, at 50; Parole Hr'g

21  Tr. 31.  When asked about the crime, Petitioner responded that his "brakes went out," so he "hit

22  this Chevy Impala."  Resp't's Answer Ex. 1, at 50-51; Parole Hr'g Tr. 31-32.  He "took off"

23  because he "got scared," as Petitioner "didn't have a license, didn't have insurance. . . . I

24  _____

25         [2] Petitioner's parents were both recovering alcoholics.  Resp't's Answer Ex. 1, at 63-64;
    Parole Hr'g Tr. 44-45.  Petitioner's mother quit drinking around 1970, when Petitioner was about
    seven years old, and Petitioner's father quit drinking in 1964 or 1965.  Resp't's Answer Ex. 1, at
26  64; Parole Hr'g Tr. 45.

                                         15

1   shouldn't have been driving an illegal car anyway."  Resp't's Answer Ex. 1, at 51; Parole Hr'g

2   Tr. 32.  When asked about his probation modification, Petitioner explained, "I violated probation

3   a couple of times for driving without a license."  Resp't's Answer Ex. 1, at 50; Parole Hr'g Tr.

4   31.

5          On July 14, 1983, Petitioner "ha[d] taking of a vehicle," which "was reduced to an

6   unknown offense."  Resp't's Answer Ex. 1, at 51; Parole Hr'g Tr. 32.  Petitioner "received an

7   unspecified misdemeanor for 15 days in county jail."  Resp't's Answer Ex. 1, at 51; Parole Hr'g

8   Tr. 32.  When asked about the crime, Petitioner answered, "A friend of mine . . . took a car" and

9   "came over to my house."  Resp't's Answer Ex. 1, at 52; Parole Hr'g Tr. 33.  They "got pulled

10  over" when "they w[ere] going to Sacramento."  Resp't's Answer Ex. 1, at 52; Parole Hr'g Tr.

11  33.  Petitioner "did 10 days" in jail, then another "15 or 20 days" because he "didn't show up for

12  court," as he had "took off" to Oregon.  Resp't's Answer Ex. 1, at 52; Parole Hr'g Tr. 33.

13         In 1984, Petitioner "received two years probation . . . for petty theft."  Resp't's Answer

14  Ex. 1, at 53; Parole Hr'g Tr. 34.

15         In 1985, "there was a 243(d), Battery and Serious Bodily Injury . . . on a police officer,"

16  who was also "in the Navy."  Resp't's Answer Ex. 1, at 53; Parole Hr'g Tr. 34.  It was "ruled to

17  be a misdemeanor" where Petitioner received probation and one year in county jail.  Resp't's

18  Answer Ex. 1, at 53; Parole Hr'g Tr. 34.  The probation officer's report revealed that Petitioner

19  knocked a sailor to the ground, "then kicked him twice in the head."  Resp't's Answer Ex. 1, at

20  54; Parole Hr'g Tr. 35.  Petitioner "stopped kicking this man" because Petitioner's friend stated

21  Petitioner would kill the sailor if he did not stop.  Resp't's Answer Ex. 1, at 54; Parole Hr'g Tr.

22  35.  Petitioner then "hit another sailor three or four times on the back and once in the head."

23  Resp't's Answer Ex. 1, at 55; Parole Hr'g Tr. 36.  The probation report showed that Petitioner

24  commented, "I got tired of hitting him.  It wasn't no fun, and I knew it was wrong."  Resp't's

25  Answer Ex. 1, at 55; Parole Hr'g Tr. 36.  The report also stated that Petitioner claimed he "had

26  ///

1    been drinking all day rum, whiskey and beer," and "wouldn't have done any bodily harm if [he]

2    hadn't been drinking."  Resp't's Answer Ex. 1, at 55; Parole Hr'g Tr. 36.

3         At the hearing, the Deputy District Attorney pointed out, "the inmate has consistently

4    stated" that he "ran to aid a friend who was in a fight with these sailors."  Resp't's Answer Ex. 1,

5    at 95; Parole Hr'g Tr. 76.  Yet, according to the Deputy District Attorney, "[t]he three individual

6    sailors stated that the group approached them demanding their money."  Resp't's Answer Ex. 1,

7    at 95; Parole Hr'g Tr. 76.  Petitioner admitted, "I don't know that [my friend] was robbing him or

8    not."  Resp't's Answer Ex. 1, at 96; Parole Hr'g Tr. 77.

9         After that, "[t]here was a misdemeanor burglary also for which [Petitioner] received a

10   year in the county jail."  Resp't's Answer Ex. 1, at 55; Parole Hr'g Tr. 36.  Petitioner explained,

11   "I got bailed out on the battery, and about two months later I broke into a car.  And that was

12   added on to the battery, that year in county jail for the battery."  Resp't's Answer Ex. 1, at 55;

13   Parole Hr'g Tr. 36.  Petitioner "was trying to steal their radio."  Resp't's Answer Ex. 1, at 56;

14   Parole Hr'g Tr. 37.

15        When rendering its decision, the Board noted that Petitioner "had a tumultuous social

16   history beginning when [he] was very small, particularly at the age eight whenever [he] began

17   [his] alcoholism."  Resp't's Answer Ex. 1, at 141; Parole Hr'g Tr. 122.  The Board recognized

18   that Petitioner "suffered adult probation and time in county jail."  Resp't's Answer Ex. 1, at 141;

19   Parole Hr'g Tr. 122.  The Board also asserted, "[a]t one point," Petitioner "nearly beat a sailor to

20   death."  Resp't's Answer Ex. 1, at 141; Parole Hr'g Tr. 122.   The Superior Court, therefore,

21   appropriately found that the Board reviewed Petitioner's unstable history, including his history of

22   violent assaults and extensive drug and alcohol abuse.

23   ///

24   ///

25   ///

26   ///

c. Need for Continued Participation in Narcotics Anonymous (NA) and

Alcoholics Anonymous (AA), and More Commitment to the Twelve

Step Program

Third, the Superior Court recognized that the Board urged Petitioner to continue participating in NA and AA, and to be more committed to the twelve step program.  Resp't's Answer Ex. 2, at 2.  Petitioner started AA and NA "the same day as the first day of [his] sobriety," i.e., September 21, 1993.  Resp't's Answer Ex. 1, at 75, 77; Parole Hr'g Tr. 56, 58.  Petitioner stated that he "woke up tired," i.e., tired of the "headaches," "B.S.," and "doing the same thing that [he] was doing on the streets and expecting different results."  Resp't's Answer Ex. 1, at 75-76; Parole Hr'g Tr. 56-57.  So, he "just decided to quit everything, quit smoking, quit drinking and quit using."  Resp't's Answer Ex. 1, at 76; Parole Hr'g Tr. 57.  The Board noted that Petitioner attended NA and AA consistently since his last hearing.  Resp't's Answer Ex. 1, at 79-80, 142; Parole Hr'g Tr. 60-61, 123.

However, Petitioner did not "start working the steps" until "three years" prior to the hearing.  Resp't's Answer Ex. 1, at 77; Parole Hr'g Tr. 58.  Petitioner confirmed he "went through 10 years of basically being a dry drunk in AA."  Resp't's Answer Ex. 1, at 78; Parole Hr'g Tr. 59.  At the hearing, Petitioner stated he was "stuck on step four."  Resp't's Answer Ex. 1, at 78; Parole Hr'g Tr. 59.  When rendering its decision, the Board pondered, "I wonder if the question that [Petitioner] can't answer" on step four is "the list of people that have harmed [Petitioner] and the people that [Petitioner] ha[d] harmed."  Resp't's Answer Ex. 1, at 147; Parole Hr'g Tr. 128.  The Board also wondered "how long it's going to take [Petitioner] to do step eight, which is make amends."  Resp't's Answer Ex. 1, at 146; Parole Hr'g Tr. 127.  The Board informed Petitioner, "You have no idea how hard that's going to be, sir.  You need to work on all 12 steps."  Resp't's Answer Ex. 1, at 146; Parole Hr'g Tr. 127.  Thus, the Superior Court appropriately held that the Board found Petitioner needed continued participation in NA and AA, and more commitment to the twelve step program.

18

1                  d.  Psychological Report Indicating Petitioner's Anti-Social Personality

2                     Disorder, and Future Violent Recidivism Risk at a Moderate Level

3        Fourth, the Superior Court properly noted that the Board examined the psychological

4 report by Dr. M. Geca, indicating Petitioner's anti-social personality disorder and his future

5 violent recidivism risk being at a moderate level.  *See* Resp't's Answer Ex. 2, at 2.  The Board

6 recounted, "The doctor further notes under Axis II that you have what has been described as an

7 anti-social personality disorder, which is improved in this controlled environment."  Resp't's

8 Answer Ex. 1, at 87; Parole Hr'g Tr. 68.  Also, "[o]verall, the doctor notes that [Petitioner's] risk

9 for future violent recidivism falls in the moderate level."  Resp't's Answer Ex. 1, at 89; Parole

10 Hr'g Tr. 70.  The Superior Court, therefore, properly found that the Board weighed Petitioner's

11 psychological report and moderate level of future violent recidivism risk against Petitioner.

12                  e.  Lack of Documented Parole Plans for Residence and Employment

13        Fifth, the Superior Court properly affirmed the Board's determination that Petitioner

14 lacked documented parole plans for residence and employment.  *See* Resp't's Answer Ex. 2, at 2.

15  At the hearing, Petitioner's work assignment was as a "teacher's aide in the vocational masonry

16 program," where he achieved above average evaluations.  Resp't's Answer Ex. 1, at 67; Parole

17 Hr'g Tr. 48.  The vocational program sought Petitioner out and interviewed Petitioner for the

18 teacher's aide position, and Petitioner started in February 2007.  Resp't's Answer Ex. 1, at 68;

19 Parole Hr'g Tr. 49.  The Board recognized, "[T]hat's saying something when the vocational

20 program wants you to come interview for the position."  Resp't's Answer Ex. 1, at 68; Parole

21 Hr'g Tr. 49.  Petitioner enjoyed this vocation because it was "hard work" that "calms [him]

22 down" and "makes him tired."  Resp't's Answer Ex. 1, at 69; Parole Hr'g Tr. 50.

23        Prior to the vocational masonry work, Petitioner "worked in the mill and cabinet as a

24 teacher's aide" from 2003 to 2005.  Resp't's Answer Ex. 1, at 70; Parole Hr'g Tr. 51.  Petitioner

25 received "excellent to above average evaluations."  Resp't's Answer Ex. 1, at 70; Parole Hr'g Tr.

26 51.

1    In 2001, Petitioner obtained his GED.  Resp't's Answer Ex. 1, at 73; Parole Hr'g Tr. 54.

2  He answered that "[l]earning to learn" was the hardest part.  Resp't's Answer Ex. 1, at 73; Parole

3  Hr'g Tr. 54.  He had to "[k]eep [his] mouth shut and listen."  Resp't's Answer Ex. 1, at 74;

4  Parole Hr'g Tr. 55.  Petitioner also added that he "was in upholstery up in Susanville, but [he]

5  got transferred back to Folsom before [he] could complete it."  Resp't's Answer Ex. 1, at 74;

6  Parole Hr'g Tr. 55.

7    When rending its decision, the Board acknowledged that Petitioner "appear[ed] to have

8  marketable skills in masonry."  Resp't's Answer Ex. 1, at 144; Parole Hr'g Tr. 125.  However,

9  Petitioner "ha[d] no documented parole plans that [he] presented to the Panel . . . , either for

10  residence or for employment in the State of California."  Resp't's Answer Ex. 1, at 144; Parole

11  Hr'g Tr. 125.  Thus, the Superior Court properly held that the Board determined Petitioner lacked

12  documented parole plans for residence and employment.

13    In sum, the Superior Court reasonably concluded "[t]he record . . . demonstrates that there

14  was certainly some evidence" showing Petitioner's release would unreasonably endanger public

15  safety.  Resp't's Answer Ex. 2, at 2.  This includes, but is "not limited to[,] the committing

16  offense, Petitioner's history of violent assaults, Petitioner's unstable history and extensive drug

17  and alcohol abuse, Petitioner's need for continued participation in NA and AA and to be more

18  committed to the 12 step program, the contents of the psychological report prepared by Dr. M.

19  Geca, indicating Petitioner's anti-social personality disorder, Petitioner's future violent

20  recidivism risk being at a moderate level, and Petitioner's lack of documented parole plans for

21  residence and employment."  *Id.*  These factors demonstrate a nexus between the facts in the

22  record regarding Petitioner's commitment offense and the ultimate conclusion that Petitioner still

23  posed a risk of danger or threat to the public.  These factors also independently demonstrate some

24  evidence in the record that Petitioner was not suitable for parole.  The Superior Court, therefore,

25  properly concluded that the Board's decision withstands the minimally stringent "some

26  evidence" test and has not violated Petitioner's right to due process of law.

G.  Declaratory and Injunctive Relief

In Petitioner's prayer for relief, Petitioner requests:  (1) "an Order for Declatory [sic] Relief;" (2) "an Order for Injunctive Relief;" (3) a declaration of "the rights of the parties;" and (4) an order either discharging or releasing Petitioner for parole.  Pet'r's Pet. 16.  Since habeas relief should not be granted, it is recommended that declaratory and injunctive relief be denied. *See supra* Part V.F.

VI.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Petitioner's request for an order to show cause is DENIED as moot;

2.  Petitioner's request for appointment of counsel is DENIED;

3.  Petitioner's request for an order initiating discovery is DENIED;

4.  Petitioner's request for an evidentiary hearing is DENIED; and

5.  Petitioner's request for judicial notice is DENIED.

IT IS HEREBY RECOMMENDED that:

1.  Petitioner's application for writ of habeas corpus be DENIED; and

2.  Petitioner's claim for declaratory and injunctive relief be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should be issued in the event he elects to file an appeal from the judgment in this

21

case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

deny certificate of appealability when it enters final order adverse to applicant).

DATED:        October 5, 2010.

_____

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

22